## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

UNITED STATES LIABILITY       *
INSURANCE COMPANY,

      **Plaintiff,**             *

      **v.**                 *            **CIVIL NO. JKB-21-0538**

**STEVEN KRAWATSKY,** *et al.***,**       *

      **Defendants.**          *

   *     *     *     *     *     *     *     *     *     *     *     *

## MEMORANDUM

In this matter, Plaintiff United States Liability Insurance Company ("USLIC") seeks a declaratory judgment as to whether it is required to defend and indemnify Defendants Steven Krawatsky, David Finkelstein, and Shoresh, Inc. (collectively with Finkelstein, the "Shoresh Defendants"), in relation to related tort lawsuits presently being litigated in Maryland state court (the "Underlying Lawsuits"). USLIC also seeks to clarify the relationship of those duties, if any, to the duties owed by Defendant Markel Insurance Company ("Markel") who provides parallel insurance coverage to the Shoresh Defendants. Presently pending before the Court are a number of Motions seeking various dispositions of this action. USLIC has filed a Motion for Summary Judgment (ECF No. 32) seeking judgment in its favor on all counts and the issuance of a declaratory judgment that it has no duty to defend or indemnify Krawatsky, Finkelstein, or Shoresh; or, in the alternative, that Markel owes such duties to Finkelstein and Shoresh and that USLIC's insurance policies are excess of those provided by Markel. (*See* ECF No. 32-1 at 1–2.) Krawatsky has filed two dispositive Motions which collectively seek to dismiss or stay this matter

1

pending the disposition of the Underlying Lawsuits, or to have this Court declare that USLIC has a duty to defend and indemnify Krawatsky. (ECF Nos. 12, 54.) The Shoresh Defendants have filed a Motion to Dismiss or Alternative Motion to Stay, seeking substantive dismissal of the Amended Complaint or, alternatively, a stay pending disposition of the Underlying Lawsuits. (*See* ECF No. 27.) In addition to his independent dispositive Motions, Krawatsky has also filed a Motion to Incorporate that seeks to adopt the arguments raised by the Shoresh Defendants in favor of dismissal or a stay. (ECF No. 44.) Last, though it has not filed any affirmative motions, Markel opposes the entry of summary judgment against it. (ECF No. 51.)

Collectively, these Motions raise five substantive issues: (1) whether this Court retains jurisdiction over this matter given the pendency of the Underlying Lawsuits; (2) whether this matter should be stayed pending resolution of the Underlying Lawsuits; (3) whether USLIC owes a duty to defend Krawatsky or the Shoresh Defendants in the Underlying Lawsuits; (4) whether USLIC owes a duty to indemnify Krawatsky or the Shoresh Defendants; and (5) whether USLIC owes those duties in conjunction with or in excess to the same duties owed by Markel. After consideration of the pending Motions, the Court concludes: (1) that it shall retain jurisdiction over this matter; (2) that resolution of USLIC's duty to indemnify and whether that duty is in excess of Markel's shall be stayed pending resolution of the Underlying Lawsuits; that (3) USLIC does not owe Krawatsky a duty to defend the Underlying Lawsuits; (4) USLIC owes the Shoresh Defendants a duty to defend in the Underlying Lawsuits; and (5) USLIC's duty to defend the Shoresh Defendants is excess of Markel's duty to defend the Shoresh Defendants in the Underlying Lawsuits.

In line with these conclusions, a separate Order shall issue granting in part Krawatsky's Motion to Dismiss or Stay (ECF No. 12); granting in part the Shoresh Defendant's Motion to

Dismiss or Stay (ECF No. 27); granting in part USLIC's Motion for Summary Judgment (ECF No. 32); granting in part Krawatsky's Motion to Incorporate (ECF No. 44); and denying Krawatsky's Motion for Summary Judgment (ECF No. 54).

## I.  Background

The pertinent facts at this stage are largely undisputed, though many are unproven allegations made in the Underlying Lawsuits that are assumed true for purposes of the pending motions.[1]  Finkelstein, through Shoresh Inc., owns and operates Camp Shoresh, which provides "year-round Jewish education programming for children, teens, college students, and adults." (Am. Compl. ¶ 10, ECF No. 17.)  Among these programs was a summer day camp available for children ages three through sixteen.  (*Id.*)  Through at least 2015, Krawatsky was a counselor at Camp Shoresh.  (*Id.*; *see also* Underlying Countercompl. ¶ 9, ECF No. 32-6.)

### A.  The Underlying Lawsuit

In the years following 2015, Krawatsky was accused of sexually abusing three children, S.B., B.A., and O.B., during the time that they attended Camp Shoresh.  (Underlying Countercompl. ¶¶ 38–173.)  Investigations by Maryland Child Protective Services ("CPS") ultimately concluded that these allegations were "unsubstantiated."  (*Id.* ¶¶ 222, 226, 293.)  On October 16, 2018, Krawatsky filed a complaint against the parents of S.B. and B.A. in the Circuit Court for Montgomery County, Maryland alleging defamation arising out the sexual abuse allegations.  (*See* ECF No. 33 at 2 n.1.)  The Complaint also named as a defendant Chaim Levin, a blogger who had documented the allegations made against Krawatsky and the associated CPS investigations.  (*See* Underlying Countercompl. ¶¶ 296–313.)

---

[1] Given that the Court stays this matter with respect to determining USLIC's duty to indemnify, "we must assume that the facts in the [underlying] complaint are true and examine . . . [whether USLIC has] a duty to defend." *Sheets v. Brethren Mut. Ins. Co.*, 679 A.2d 540, 542 (Md. 1996).

In February of 2019, the defendants in the Montgomery County lawsuit filed a countercomplaint against Krawatsky and the Shoresh Defendants (*see* ECF No. 32-3), which was subsequently dismissed. (ECF No. 33 ¶¶ 6–7.) Following dismissal of their countercomplaint, the parents of S.B. and B.A. filed a separate lawsuit against Krawatsky and the Shoresh Defendants on behalf of both themselves and their children. (ECF No. 32-4.) This lawsuit, along with a lawsuit brought by the parents of O.B., were consolidated with the case originally filed by Krawatsky. (*See* ECF No. 33 ¶¶ 7, 11; *see also* ECF No. 32-5 (O.B. Complaint).) As part of consolidation, the parents of S.B., B.A., and O.B., along with Chaim Levin, filed an Amended Counter Complaint/Complaint (the "Underlying Countercomplaint"), which the Montgomery County Court ordered "entered as the operative pleading for the claims of these parties." (*See* ECF No. 33 ¶ 14; *see also* Underlying Countercompl.) The allegations in the Underlying Countercomplaint encompass the universe of the allegations made in the Underlying Lawsuits. (*See* ECF No. 27 at 1–2 ("The current operative pleading for the purposes of this matter is the [Underlying Countercomplaint]."); ECF No. 33 ¶¶ 14–15.)[2]

The Underlying Countercomplaint brings claims against Krawatsky for Assault, Battery, False Imprisonment, and Invasion of Privacy. (Underlying Countercompl. ¶¶ 356–380, 483–508.) It further brings claims against the Shoresh Defendants for Negligence, Invasion of Privacy, and Intentional Infliction of Emotional Distress. (Underlying Countercompl. ¶¶ 399–482, 493–508.) These lawsuits were tendered to USLIC, who agreed to provide a defense under reservation of rights to all three Defendants. (Am. Compl. ¶¶ 42, 43.) The defense with respect to the Shoresh

---

[2] Krawatsky's Motion for Summary Judgment appears to rely on an earlier version of the pleadings in the Underlying Lawsuit that was filed on or around February 19, 2019. (*See* ECF No. 54-4 at 1 (date stamp illegible), 19.) To the extent that this reliance suggests a disagreement about which document represents the operative pleading, that dispute is irrelevant for purposes of these motions as the allegations in that pleading are materially identical in all relevant respects to the allegations in the Underlying Countercomplaint.

Defendants has been provided on a pro-rata basis with Markel, who has agreed to provide a defense under a General Commercial Liability Policy (the "GCL Policy"). (*See* ECF No. 32-8 (letter confirming Markel's intention to defend the Shoresh Defendants).) USLIC has represented that its provision of a defense to Krawatsky and the Shoresh Defendants is contingent on this declaratory judgment action. (Am. Compl. ¶¶ 42–43.)

### B. The USLIC Insurance Policy

The central policy in this declaratory judgment action is a USLIC Non-Profit Directors and Officers Liability Policy (the "Policy") held by Shoresh, Inc. (*See* Policy, ECF No. 32-7.) Shoresh Inc. is referred to in the Policy as the Organization. (*See* Policy at 8.)[3] The Policy contains two pertinent and independent coverage parts: Coverage Part A. Non Profit Directors and Officers Liability (the "D&O Section"); and Coverage Part B. Employment Practices Liability (the "EPL Section"). For purposes of the pending Motions, the most relevant portions of the D&O and EPL Sections are the following.

#### 1. The D&O Section

Under the D&O Section of the Policy, USLIC:

> [W]ill pay on behalf of the Insured Loss in excess of the RETENTION, not exceeding the Limit of Liability for which this Coverage Part applies, that the Insured shall become legally obligated to pay because of Claims first made against the Insured during the Policy Period or during the Extended Reporting Period, if applicable, for Wrongful Act arising solely out of an Insured's duties on behalf of the Organization.

(Policy at 6.) By its plain terms, the D&O Section only provides coverage for certain Wrongful Acts, which include:

> [A]ny actual or alleged act, error, omission, misstatement, misleading statement, neglect or breach of duties, or Personal Injury Act committed or allegedly committed;

---

[3] Citations to the Policy are to the page number of the Exhibit (with the Exhibit cover being page 1) rather than to the page number listed on the bottom right-hand corner of the Policy.

    (1) by the Organization; or

    (2) by the Individual Insureds arising solely from duties conducted on behalf of the Organization or asserted against an Individual Insured because of (1) above

(Policy at 9.) The D&O Section further elucidates these definitions, providing that Individual Insureds include "directors, trustees, officers, Employees, or committee members of the Organization," that Employees are "any natural person whose labor or service is engaged by and directed by the Organization while performing duties related to the conduct of the Organization's business" and that Personal Injury Acts are acts of "actual or alleged malicious prosecution, invasion of privacy, wrongful entry or eviction, libel, slander or defamation." (Policy at 7–8.)

Coverage for Wrongful Acts is limited by several Exclusions, which outline circumstances under which USLIC "shall not be liable to make payment for Loss or Defense Costs in connection with any Claim made against the Insured." (Policy at 9.) Relevant here are Exclusions A, B, and H. Exclusion A, which is modified by a Personal Injury Exclusion Endorsement, excludes coverage for any Loss arising from:

> [A]ny actual or alleged bodily injury, sickness, humiliation, mental anguish, emotional distress, assault, battery, invasion of privacy, wrongful entry, eviction, false arrest, false imprisonment, malicious prosecution, disease or death of any person, or damage to or destruction of any tangible property including any resulting loss of use; provided that this exclusion shall not apply to Claims for libel, slander or defamation that result from a Wrongful Act. However, coverage afforded for libel, slander or defamation shall be excess of the Insured's General Liability policy;

(Policy at 24.) Exclusion B independently excludes coverage for "[a]ny dishonest, fraudulent or criminal Wrongful Act by the Insured, however, this exclusion shall not apply unless and until a final adjudication or judgment is rendered against the Insured as to this conduct." (Policy at 9.) Finally, Exclusion H renders USLIC:

[N]ot [ ] liable to make payment for Loss or Defense Costs in connection with any Claim made against the Insured arising out of, directly or indirectly resulting from or in consequence of, or in any way involving:  Any actual or alleged: refusal to employ; termination of employment; employment related coercion, demotion, evaluation, reassignment, discipline, workplace conditions, false imprisonment, defamation, harassment, humiliation, or discrimination of employment; other employment-related practices, policies, acts or omissions; or sexual harassment by the Insured against any person(s) or entity; or negligence involving any of the foregoing[.]

(Policy at 9–10.)

### 2. The EPL Section

Similar to the D&O Section, under the EPL Section of the Policy USLIC:

[W]ill pay on behalf of an Insured Loss in excess of the RETENTION, not exceeding the LIMIT OF LIABILITY for which this coverage applies, that an Insured shall become legally obligated to pay because of Claims first made against the Insured during the Policy Period or during any Extended Reporting Period, if applicable, for Wrongful Employment Acts arising solely out of an Insured's duties on behalf of the Organization.

(Policy at 15.) Coverage under the EPL Section extends only to Insureds, who are the Organization and the same individual persons covered by the D&O Section, *i.e.*, "directors, trustees, officers, Employees, or committee members of the Organization." (Policy at 17.) However, the EPL Section provides coverage only for Wrongful Employment Acts (as opposed to Wrongful Acts), which include any actual or alleged act of:

(1) Discrimination;
(2) Harassment;
(3) Retaliation;
(4) Wrongful Termination;
(5) Workplace Tort;

or violation of certain state and federal employment laws such as the Family and Medical Leave Act of 1993. (Policy at 19.) Although most of the Wrongful Employment Acts are limited to intra-workplace conduct, the definition of a Wrongful Employment Act "also include[s] any actual or alleged act of: Third Party Discrimination [or] Third Party Harassment." (*Id.*) Amongst the

7

types of Third Party Harassment covered by the EPL Section is "Sexual Harassment including any

unwelcome sexual advances, requests for sexual favor or other verbal or physical conduct of a

sexual nature against a Third Party." (*Id.*) Third parties are "any person(s) with whom an Insured

in their capacity as such interacts while the Insured is performing duties related to the conduct of

the Organization's business." (Policy at 18.)

The EPL Section is also subject to various Exclusions and, again, Exclusions A and B are

relevant to this case. Exclusion A, as modified by the Personal Injury Exclusion Endorsement,

provides that USLIC shall not provide coverage for:

> Any actual or alleged bodily injury, sickness, invasion of privacy, wrongful entry,
> eviction, false arrest, false imprisonment, malicious prosecution, assault, battery,
> wrongful entry, eviction, disease or death of any person, or damage to or destruction
> of any tangible property including any resulting loss of use. This exclusion shall
> not apply to Claims for mental anguish, emotional distress, humiliation, libel,
> slander, or defamation that result from a Wrongful Employment Act[.]

(Policy at 24.) Exclusion B, like its counterpart in the D&O Section, excludes from coverage:

> Conduct of the Insured or at the Insured's direction that is fraudulent, dishonest or
> criminal provided that this exclusion will not apply to: (1) Defense Costs incurred
> until such conduct is proven in fact to be fraudulent, dishonest or criminal; or (2)
> the strictly vicarious liability of the Insured for the fraudulent, dishonest or criminal
> conduct of another Insured . . . it being understood that this Exclusion applies
> whether the Insured may be held liable as an employer or in any other capacity and
> to any obligation to contribute with or indemnify another with respect to such
> Claim[.]

(Policy at 20.)

## II.    *Legal Standards*

The pending Motions require analysis under four legal umbrellas: (1) dismissal pursuant

to Federal Rule of Civil Procedure 12(b)(6); (2) declination of jurisdiction under the Declaratory

Judgment Act, 28 U.S.C. § 2201 and the principles outlined in *Nautilus Ins. Co. v. Winchester*

*Homes, Inc.*, 15 F.3d 371, 376 (4th Cir. 1994) (the "*Nautilus* factors"); (3) a stay pursuant to the

Court's inherent equitable discretion; and (4) summary judgment pursuant to Federal Rule of Civil Procedure 56.

### A. Rule 12(b)(6) Motion to Dismiss

When "considering a motion to dismiss" pursuant to Rule 12(b)(6), the Court must "accept as true all well-pleaded allegations and view the complaint in the light most favorable to the plaintiff." *Venkatraman v. REI Sys., Inc.*, 417 F.3d 418, 420 (4th Cir. 2005). To survive a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 446 U.S. at 662. "A pleading that offers 'labels and conclusions' or . . . 'naked assertion[s]' devoid of 'further factual enhancement'" will not suffice. *Id.* (alteration in original) (quoting *Twombly*, 550 U.S. at 555, 557).

### B. Discretionary Dismissal Under 28 U.S.C. § 2201

"Under the Declaratory Judgment Act, a district court, in 'a case of actual controversy within its jurisdiction . . . *may* declare the rights and other legal relations of any interested party seeking such declaration.'" *Trustgard Ins. Co. v. Collins*, 942 F.3d 195, 201 (4th Cir. 2019) (quoting 28 U.S.C. § 2201(a)) (emphasis in original). The permissive language in the "Act gives federal courts discretion to decide whether to declare the rights of litigants. . . . Rather than grant litigants a right to judgment in their case, it merely permits the courts to hear those cases." *Id.* While "district courts have great latitude in determining whether to assert jurisdiction over declaratory judgment actions," *Aetna Cas. & Sur. Co. v. Ind-Com Elec. Co.*, 139 F.3d 419, 422 (4th Cir. 1998), they are not "without guidance in exercising this discretion." *United Capitol Ins.*

*Co. v. Kapiloff*, 155 F.3d 488, 493 (4th Cir. 1998). A declaratory judgment "is appropriate when the judgment will serve a useful purpose in clarifying and settling the legal relations in issue, and . . . when it will terminate and afford relief from the uncertainty, insecurity, and controversy giving rise to the proceeding." *Centennial Life Ins. Co. v. Poston*, 88 F.3d 255, 256 (4th Cir. 1996).

Further, "whenever a parallel proceeding is pending in state court, district courts must also take into account 'considerations of federalism, efficiency, and comity'" in determining whether to retain jurisdiction over a declaratory judgment action. *Kapiloff*, 155 F.3d at 493 (quoting *Nautilus Ins. Co.*, 15 F.3d at 376). In assessing these considerations, the Fourth Circuit has identified four key factors for consideration:

> (1) whether the state has a strong interest in having the issues decided in its courts; (2) whether the state courts could resolve the issues more efficiently than the federal courts; (3) whether the presence of "overlapping issues of fact or law" might create unnecessary "entanglement" between the state and federal courts; and (4) whether the federal action is mere "procedural fencing," in the sense that the action is merely the product of forum-shopping.

*Id.*

### C. Discretionary Stay

"The power to stay proceedings is incidental to the power inherent in every court to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants." *Maryland v. Univ. Elections, Inc.*, 729 F.3d 370, 379 (4th Cir. 2013) (quoting *Landis v. N. Am. Co.*, 299 U.S. 248, 254 (1936)). The Supreme Court has confirmed "federal courts' inherent authority to . . . stay an action pending the outcome of parallel proceedings in another court." *United States v. Oliver*, 878 F.3d 120, 124 (4th Cir. 2017) (citing *Landis*, 299 U.S. at 254). In determining whether to exercise this authority, courts consider various factors "includ[ing] the interests of judicial economy, the hardship and equity of the moving party in the

absence of a stay, and the potential prejudice to the non-moving party in the event of a stay." *Landress v. One Solar LLC*, 243 F. Supp. 3d 633, 646 (M.D.N.C. 2017) (citation omitted).

### D. Summary Judgment

Federal Rule of Civil Procedure 56 provides that a party can move for summary judgment on a "claim or defense—or the part of [any] claim or defense," provided it shows "that there is no genuine dispute as to any material fact" and that it is "entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The burden is on the moving party to demonstrate the absence of any genuine dispute of material fact. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). If a party carries this burden, then the Court will award summary judgment, unless the opposing party can identify specific facts, beyond the allegations or denials in the pleadings, that show a genuine issue for trial. Fed. R. Civ. P. 56(e). If sufficient evidence exists for a reasonable factfinder to render a verdict in favor of the party opposing the motion, then a genuine dispute of material fact is presented, and summary judgment will be denied. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). However, the "mere existence of a scintilla of evidence in support of the [opposing party's] position" is insufficient to defeat a motion for summary judgment. *Id.* at 252. When both parties file motions for summary judgment, the Court evaluates "each party's motion on an individual and separate basis, determining, in each case, whether a judgment may be entered in accordance with the Rule 56 standard." *Bryant v. Better Bus. Bureau of Greater Md., Inc.*, 923 F. Supp. 720, 729 (D. Md. 1996) (citations omitted).

### III. Analysis

As explained above, disposition of the pending Motions requires resolution of five overarching issues. The first three of those issues are threshold questions disputing if and when this Court should resolve the merits of this case.

11

First, Krawatsky argues that this Court should dismiss this case pending disposition of the

Underlying Lawsuits under the Maryland law principles enumerated in *Allstate Ins. Co. v. Atwood*,

572 A.2d 154 (Md. 1990). Second, Krawatsky and the Shoresh Defendants argue that, even if the

case is not categorically barred by *Atwood*, this Court should utilize its discretion to decline

jurisdiction under the federal Declaratory Judgment Act. Third, the same Defendants argue that,

should this Court intend to resolve the merits of this case, it should impose a stay and only do so

after resolution of the Underlying Lawsuits.

Parsing through these procedural arguments, the Court concludes that neither *Atwood* nor

considerations of federalism and comity require or favor dismissing this case due to the pendency

of the Underlying Lawsuits. However, considerations of judicial economy and the relative

hardships imposed by a stay favor staying the portions of this case related to USLIC's duty to

indemnify Krawatsky and the Shoresh Defendants and whether those duties are primary or excess

to Markel's parallel indemnification responsibilities.

### A. *Dismissal Under* Brohawn[4]

Under Maryland law, "[a] declaratory judgment action prior to the trial of a tort action

against the insured" is generally only appropriate for "resolving questions of policy coverage

where those questions are independent and separable from the claims asserted in a pending suit by

---

[4] It is not clear that *Brohawn* and its progeny, which consider the propriety of exercising jurisdiction over a declaratory judgment under Maryland law, are applicable to this Court. *See Brohawn v. Transam. Ins. Co.*, 347 A.2d 842, 849 (Md. 1975) (concluding that "it is inappropriate to grant a declaratory judgment . . . under the Uniform Declaratory Judgment Act, [Md. Code Cts. and Jud. Proc. § 3-409.]"). This Court's dismissal, *vel non*, of a declaratory judgment in light of a parallel court proceeding is governed by the federal Declaratory Judgment Act, 28 U.S.C. § 2201, and federal case law delineating standards for the exercise of the permissive jurisdiction granted thereunder. *See supra* Part III.B. Accordingly, although this Court is sitting in diversity, "federal law determines whether or not this Court may properly render a declaratory judgment in this case." *Nationwide Mut. Ins. Co. v. Welker*, 792 F. Supp. 433, 439 (D. Md. 1992).

That said, USLIC has not argued that these principles should not guide the Court's discretionary exercise of jurisdiction under the federal Declaratory Judgment Act, discretion which is informed by issues of "federalism [ ] and comity." *Kapiloff*, 155 F.3d at 493. Because USLIC does not contend that the *Brohawn* line of cases are categorically inapplicable here, the Court goes on to explain why they do not favor dismissal.

an injured third party." *Brohawn v. Transam. Ins. Co.*, 347 A.2d 842, 848 (Md. 1975). Krawatsky argues that these principles, as refined and applied by later Maryland cases, preclude USLIC's claim, which he argues "seeks to have resolved in a declaratory judgment proceeding questions which would be fully decided in pending tort actions." *Id.*

However, an analysis of the Maryland caselaw interpreting *Brohawn* confirms that the issues raised in this case are "independent and separable from the claims asserted in [the Underlying Lawsuits]." *Brohawn*, 347 A.2d at 848. Importantly, none of the grounds on which USLIC seeks to deny coverage have been or are likely to be raised and litigated in the Underlying Lawsuits.

The Maryland Court of Appeals' decision in *Litz v. State Farm* confirms that this declaratory judgment is proper. *Litz*, 695 A.2d at 566. In that case, an insurer brought a declaratory judgment action seeking to determine its obligation to defend and indemnify, under a homeowner's policy, two insureds in a negligence action arising from babysitting services they provided out of their home. *Id.* at 568. The declaratory judgment action raised two key questions: (1) whether the babysitting services were subject to a "business pursuits" exception in the policy and (2) whether the husband had been involved in the babysitting services. *Id.* at 568–69. In considering "whether . . . the circuit court erred in entertaining the declaratory judgment action prior to the resolution of the underlying tort trial," the Maryland Court of Appeals concluded that *Brohawn* applied differently to each of the two questions. *Id.* at 573.

On the one hand, the Maryland Court of Appeals concluded that "the circuit court erred in entertaining a declaratory judgment [as to the husband] prior to the tort trial." *Id.* at 574. This was because the issue of whether he "participated in the babysitting, regardless of whether it is classified as a business pursuit, is an issue to be resolved in the underlying tort case." *Id.* This

was because the husband "worked for the Washington Metropolitan Area Transit Authority and was rarely at home during the hours that [his wife] cared for [the underlying plaintiff]." *Id.* at 568 n.3. Thus to hold the husband liable, plaintiff would be required to prove that he was involved in the babysitting in the underlying lawsuit. Because the husband "demonstrated a reasonable potential that the issue triggering coverage, *i.e.*, that he never participated in the babysitting, will be generated at trial" the Maryland Court of Appeals ultimately concluded that a declaratory judgment on this issue was premature. *Id.* at 573–75.

On the other, it held that "the circuit court properly entertained the declaratory judgment actions as to [the wife because she] did not deny that she was babysitting for [the tort plaintiff] at the time of the accident." *Id.* The Court also noted that "had the declaratory judgment action [as to the husband] decided only whether the babysitting in this case constituted a business pursuit it may have been appropriate." *Id.* at 575 n.7. Both insureds could litigate this question prior to resolution of the underlying tort suit because "[w]hether the babysitting in this case rose to the level of a business pursuit under the terms of the policy would not be relevant to establishing the elements of the [underlying plaintiffs'] negligence claim against the [insureds]." *Id.*

So too here, where USLIC's principal argument is that Krawatsky's conduct is not covered by the Policy because it was categorically outside the scope of his employment with Shoresh, Inc. (*See* Am. Compl. ¶¶ 75–76, 91; *see also* ECF No. 32-1 at 6–13.) The scope of Krawatsky's employment is simply "not [ ] relevant to establishing the elements of the [underlying claim]" against him and is therefore properly the subject of a declaratory judgment action. *Litz*, 695 A.2d at 575 n.7. Because there are no "allegations [in] the tort suit concerning scope of employment[,]" such as an attempt to hold the Shoresh Defendants vicariously liable, the authority on which Krawatsky relies is inapposite. *See St. Paul Fire and Marine Ins. Co. v. Pryseski*, 438 A.2d 282,

14

287 (Md. 1981) (holding that "the tort suit determined the scope of employment issue" because of "allegations [in] the tort suit concerning scope of employment"); *Harleysville Preferred Ins. Co. v. Rams Head Savage Mill, LLC*, 187 A.3d 797, 816 (Md. Ct. Spec. App. 2018) (emphasis added) ("If the circuit court here were to have taken evidence to determine whether [insured] really had acted within the scope of his duties for [the Organization], *as alleged in the underlying complaints*, it would have been deciding an issue that still needed to be resolved in the underlying actions.").

The same is true of USLIC's alternative arguments that (1) the exclusions in the Policy categorically foreclose coverage for the claims made in the Underlying Lawsuits, and (2) that Maryland public policy precludes insurance coverage for child abuse. (ECF No. 32-1 at 13–24.) Since none of these arguments are pertinent to the claims in the Underlying Lawsuit, and each is predicated on the notion that those claims are "patently outside the terms of the insurance contract[,]" Maryland law does not bar their consideration prior to the resolution of the Underlying Lawsuits. *Atwood*, 572 A.2d at 157.

### B.   Jurisdiction Under the Declaratory Judgment Act[5]

Although this Court concludes that it can entertain this declaratory judgment action prior to the resolution of the Underlying Lawsuits, Krawatsky further argues that it should not do so under the inherent jurisdictional discretion afford by the Declaratory Judgment Act, 28 U.S.C. § 2201.   (*See* ECF No. 12-1 at 8–22.)   As noted, the Declaratory Judgment Act's permissive language provides that a federal court "*may* declare the rights and other legal relations of any interested party seeking such a declaration." 28 U.S.C. § 2201(a) (emphasis added); *see also*

---

[5] Some decisions have discussed the declination of jurisdiction over cases seeking only declaratory judgments under the rubric of abstention under the *Brillhart/Wilton* line of cases. *See Nautilus Ins. Co. v. 200 W. Cherry St., LLC*, 383 F. Supp. 3d 494, 505 (D. Md. 2019) ("The inherent discretion of a federal court to abstain from entertaining a declaratory action is often referred to as *Wilton/Brillhart* abstention or *Wilton* abstention."); *see also Wilton v. Seven Falls Co.*, 515 U.S. 277 (1995); *Brillhart v. Excess Ins. Co. of Am.*, 316 U.S. 491 (1942). Accordingly, this decision uses the phrases "abstain" and "decline jurisdiction" interchangeably in its analysis of the propriety of hearing this case in light of the Underlying Lawsuits.

*Trustgard*, 942 F.3d at 201.  Generally, a court should do so "when the judgment will serve a useful purpose in clarifying and settling the legal relations in issue, and . . . when it will terminate and afford relief from the uncertainty, insecurity, and controversy giving rise to the proceeding." *Centennial Life Ins. Co. v. Poston*, 88 F.3d 255, 256 (4th Cir. 1996).  Where, as here, the declaratory judgment relates to a parallel state proceeding, courts must also take into account "considerations of federalism, efficiency, and comity." *Kapiloff*, 155 F.3d at 493 (internal quotation marks and citation omitted).  These further considerations require the Court to consider four factors:

> (1) whether the state has a strong interest in having the issues decided in its courts; (2) whether the state courts could resolve the issues more efficiently than the federal courts; (3) whether the presence of "overlapping issues of fact or law" might create unnecessary "entanglement" between the state and federal courts; and (4) whether the federal action is mere "procedural fencing," in the sense that the action is merely the product of forum-shopping.

*Id.* at 493–94 (quoting *Nautilus Ins. Co. v. Winchester Homes, Inc.*, 15 F.3d 371, 377 (4th Cir. 1994)).

It is "well established that a declaration of parties' rights under an insurance policy is an appropriate use of the declaratory judgment mechanism" as a declaratory judgment in such cases "undoubtedly serve[s] a useful purpose in settling [ ] disputed rights." *Kapiloff*, 155 F.3d at 494; *see also Nautilus Ins. Co.*, 15 F.3d at 375–76 ("[W]e have frequently approved the use of federal declaratory judgment actions to resolve disputes over liability insurance coverage, even in advance of a judgment against the insured on the underlying claim for which coverage is sought.").  Indeed, the Fourth Circuit has concluded that undue caution in asserting federal jurisdiction over cases similar to the one at bar constitutes an abuse of discretion. *See Minn. Laws. Mut. Ins. Co. v. Antonelli, Terry, Stout & Kraus, LLP*, 355 F. App'x 698, 704 (4th Cir. 2009); *Penn-Am. Ins. Co. v. Coffey*, 368 F.3d 409, 414–15 (4th Cir. 2004).  In addressing the propriety of asserting federal

16

jurisdiction in declaratory judgments seeking to clarify the scope of insurance obligations, courts ordinarily focus on concerns of entanglement between the federal and state courts, as "[n]one of the remaining three *Nautilus* factors plays a particularly important role." *Penn-Am. Ins.*, 368 F.3d at 414. Further, and as is the case here, the bifurcated analysis of the duties to defend and indemnify mandated by state insurance law often mitigates or eliminates the risk of undue entanglement.

### 1. Entanglement

In determining whether undue entanglement will result from entertaining a declaratory judgment, the Court must determine whether its "efforts to decide the coverage issues would result in . . . gratuitous interference[] with state court proceedings by preempting critical factual findings that the state court will have to make in resolving [the Underlying Lawsuits.]" *Id.* at 413. Neither category of coverage issue presented in this case—that is, USLIC's duty to (1) defend and (2) indemnify Krawatsky or the Shoresh Defendants creates unmanageable entanglement issues warranting abstention.

### a. Duty to Defend

Determination of USLIC's duty to defend cannot entangle this Court with the Underlying Lawsuits because "the duty-to-defend question in this case will not require the [Court] to resolve factual questions *at all*." *Penn-Am. Ins. Co.*, 368 F.3d at 413 (emphasis added). This is because in "determin[ing] whether an insurer has a duty to defend" under Maryland law, the Court must ordinarily only "'focus[] upon the language and requirement of the policy, and . . . the *allegations* of the tort suit.'" *Moscarillo v. Prof. Mgmt. Servs., Inc.*, 899 A.2d 956, 961 (Md. Ct. Spec. App. 2006) (emphasis added) (quoting *St. Paul Fire & Marine Ins. Co. v. Pryseski*, 438 A.2d 282

(1981)).[6] Thus, there is no concern that "resolution of [ ] common issues might be entitled to preclusive effect in the state action" because the Court need not resolve the truth or falsity of the allegations in the Underlying Lawsuits in determining whether USLIC owes a duty to defend. *See Auto-Owners Ins. Co. v. Waters*, Civ. No. HEH-09-0134, 2009 WL 3378657, at *5 (E.D. Va. Oct. 20, 2009) (quoting *Nautilus*, 15 F.3d at 377).

> **b.  *Duty to Indemnify***

USLIC's claim for declaratory relief as to its duty to indemnify also creates no entanglement concerns because this Court cannot preempt the determination of liability in the Underlying Lawsuits.  Under Maryland law, "the duty to indemnify depends upon liability[,]" meaning that it "is triggered only if the insured's *established* liability is actually covered under the policy." *Nautilus Ins. Co. v. 200 W. Cherry St., LLC*, 383 F. Supp. 3d 494, 509 (D. Md. 2019) (emphasis modified) (quoting *Walk v. Hartford Cas. Ins. Co.*, 852 A.3d 98, 106 (Md. 2004)). Federal courts in this District have operationalized this principle by concluding that "a declaratory judgment [on indemnification] is premature" during the pendency of the tort litigation because it seeks to "resolve a question that may never become ripe, based on facts that are purely hypothetical." *Allstate Ins. Co. v. Preston*, Civ. No. JKB-19-0429, 2019 WL 3067918, at *3 (D. Md. May 12, 2019); *see also Allstate Ins. Co. v. Powe*, Civ. No. CCB-19-1376, 2020 WL 1159000, at *3 (D. Md. Mar. 10, 2020) ("[I]t could be inefficient for the court to decide questions of indemnity prior to resolution of the Underlying Suit, as any declaratory judgment . . . would be moot if the [ ] Insureds prevail in state court."). Given this sequencing between liability in the

---

[6] Maryland law allows for consideration of extrinsic evidence beyond the policy and the underlying complaint in limited cases. *See Aetna Cas. & Sur. Co. v. Cochran*, 651 A.2d 859, 864–65 (Md. 1995). All parties agree, however, that the duty-to-defend issue can be resolved solely on the basis of the Policy and the allegations in the Underlying Lawsuits. (*See* ECF Nos. 27, 32, 54.) Accordingly, the Court need not consider whether extrinsic evidence proffered to support a finding that USLIC owes a duty to defend could result in entanglement with the Underlying Lawsuits.

Underlying Lawsuits and this Court's ability to determine USLIC's indemnification obligations, there is no possibility that retaining jurisdiction over this case will lead this Court to "frustrate the orderly progress of [the] state court proceedings by leaving the state court with some parts of [the] case foreclosed from further examination." *Nautilus Ins. Co.*, 15 F.3d at 377 (internal quotation marks and citation omitted) (alterations in original). In short, this Court either need not or cannot resolve the factual issues related to Krawatsky's or the Shoresh Defendants' liability with respect to the allegations in the Underlying Lawsuits.

### 2. *Remaining Factors*

The remaining *Nautilus* factors, state interest, efficiency, and procedural fencing, also do not warrant abstention in this case. As noted, none of these factors "plays a particularly important role . . . in assessing whether the declaratory judgment action should be decided now" where the underlying tort action will not resolve the insurance coverage questions. *Penn-Am. Ins. Co.*, 368 F.3d at 414. Indeed, the Fourth Circuit has confirmed that "the efficiency concern is not present [at all] when 'the contractual coverage issue will not be decided by the state . . . case.'" *Minn. Laws.*, 355 F. App'x at 703 (quoting *Penn-Am. Ins. Co.*, 368 F.3d at 414) (some alterations in original).

### a. *State Interest*

The state interest factor is also muted where "the contractual coverage issue will not be decided by the state tort case, and [the insurer] is not a party to the state case." *Penn-Am. Ins. Co.*, 368 F.3d at 414. While some cases have held "there exists a [general state interest] in having the most authoritative voice speak on the meaning of the applicable law, and that voice belongs to the state courts when state law controls the resolution of the case," *Mitcheson v. Harris*, 955 F.2d 235, 237 (4th Cir. 1992), more recent explications of the *Nautilus* factors have limited the state

19

interest to issues "which can fairly be called complex." *New Wellington Fin. Corp. v. Flagship Resort Dev. Corp.*, 416 F.3d 290, 297 (4th Cir. 2005). In contrast, those more recent cases have explained that "the State's interest is 'not particularly significant' where any state law issues are standard and 'unlikely to break new ground.'" *Penn-Am. Ins. Co.*, 368 F.3d at 414 (quoting *Kapiloff*, 155 F.3d at 494). This includes cases where "the issues involved are standard ones of agency and contract interpretation." *Kapiloff*, 155 F.3d at 494. With one caveat, the straightforward state law issues in this case do not give rise to a strong state interest warranting abstention.

The only issue of state law presented in this case that cannot be deemed "standard" is USLIC's argument that Maryland public policy prevents insurers from defending or indemnifying insureds against claims arising from the sexual abuse of minors. (*See* ECF No. 32-1 at 13–20.) Although USLIC provides great detail about Maryland statutes reflecting the State's view that sexual abuse of minors is repugnant, it provides no evidence that a Maryland court has explicitly considered whether this repugnancy forecloses insurance coverage in this case. *Id.* Thus, considering a claim that squarely presented this question could potentially "be disruptive of state efforts to establish a coherent policy with respect to a matter of substantial public concern." *Riley v. Dozier Internet L., PC*, 371 F. App'x 399, 403 (4th Cir. 2010) (internal quotation marks omitted).

However, this potentially novel issue of state law does not warrant abstention at this time because it is not squarely presented by this case. This is because the Court concludes that the terms of the Policy only cover actions taken by an Employee within the scope of their employment. *See infra* Part III.D.1. Under Maryland law, sexual abuse of a minor is categorically outside the scope of employment. *See Montgomery Cnty. Bd. of Educ. v. Horace Mann Ins. Co.*, 860 A.2d 909, 920 (Md. 2004) ("[S]exual abuse of a minor is criminal conduct . . . that is not within the scope of a

teacher's employment or authority."); *see also Tall v. Board of Sch. Comm'rs of Balt. City*, 706 A.2d 659, 670 (Md. Ct. Spec. App. 1998) ("The decision . . . is consistent with decisions from other jurisdictions that have refused to hold employers liable under the doctrine of *respondeat superior* for sexual assaults upon children perpetrated by school employees.") (collecting cases). Thus, the question of whether the Policy is precluded by Maryland public policy from providing indemnification for sexual abuse of a minor is obviated by the fact that the terms of the Policy will never require indemnification for such claims.[7]   Accordingly, because the questions of state law actually at issue in this case will not be "difficult, complex or unsettled" this Court need not abstain from resolving them. *Riley*, 371 F. App'x at 403; *see also VRCompliance LLC v. HomeAway, Inc.*, 715 F.3d 570, 573 (4th Cir. 2013) (explaining that district courts should not treat the *Nautilus* factors "as a mechanical checklist, but rather should apply them flexibly in light of the particular circumstances of each case").

### b. *Procedural Fencing*

Further, although Krawatsky alleges that USLIC's claim should be rejected as mere "procedural fencing[,]" this allegation is not borne out by the status of the Underlying Lawsuits. (*See* ECF No. 12 at 20–22.)   Concerns of procedural fencing generally arise when a litigant "races to federal court in an effort to get certain issues that are *already pending* before the state courts resolved first in a more favorable forum." *Powe*, 2020 WL 1159000, at *5 (emphasis added).   This is simply not such a case.   Nor is this the case where the insurance claim, though not pending in state court, is "bound to arise during the course of [the state court] proceedings." *Continental Cas. Co. v. Fuscardo*, 35 F.3d 963, 968 (4th Cir. 1994).   USLIC is not a party to the Underlying

---

[7] USLIC does not appear to argue that Maryland public policy forecloses insurance coverage for the sorts of abuse-related claims that may fall within the scope of employment under Maryland law. *See infra* Part III.D.1.b.ii.   Even if USLIC raised this argument, such allegations are not made in the Underlying Lawsuits and therefore would not create state interest concerns in this case.

Lawsuits and there is no suggestion that it was on notice that a "claim would be lodged against it when [it] chose to file a separate action in federal court." *Id.*

Equally hollow is Krawatsky's claim that USLIC's decision to initially defend him in the Underlying Lawsuits was a tactic intended to garner USLIC's preferred forum in this lawsuit. (*See* ECF No. at 21–22.) Even had Krawatsky had the opportunity to file the inverse of this lawsuit—suing USLIC after they declined coverage—USLIC could have readily removed those claims to this Court. *See* 28 U.S.C. § 1441(b). Krawatsky does not allege that he would have filed suit in Pennsylvania state court, nor explain why such an action would not, itself, have been blatant procedural fencing considering this action involves interpretation of the duties owed in a Maryland tort suit based on an insurance contract issued in Maryland. *See* § 1441(b)(2) (noting that civil actions are not removable if "any of the parties in interest properly joined as defendants is a citizen of the State in which such action is brought"); (Am. Compl. ¶ 1 (averring USLIC is a citizen of Pennsylvania)). Simply put, the status of this case and the Underlying Lawsuits simply fails to logically substantiate Krawatsky's allegation that USLIC has engaged in improper procedural fencing.

In conclusion, none of the *Nautilus* factors warrant declining jurisdiction over USLIC's declaratory judgment claims. This Court is well positioned to resolve a straightforward question of Maryland contract law that is not, nor is likely to be, presented in the Underlying Lawsuits. Resolving this question will not entangle this Court with those lawsuits and the propriety of resolving these matters is not undercut by indicia of procedural fencing. Finding no compelling reason not to do so, the Court will retain jurisdiction under 28 U.S.C. § 2201(a).

## C. Stay Pending Disposition of the Underlying Lawsuits

Krawatsky, now joined by the Shoresh Defendants, also argues that to the extent it is not dismissed, this matter should be stayed pending disposition of the Underlying Lawsuits. (See ECF No. 27 at 7–8.) Krawatsky premises his request for a stay on the same factors that he argues warrant abstention from this case. (See ECF No. 12-1 at 8 ("Plaintiff's Complaint should be dismissed or stayed based on the abstention factors in *Nautilus*.").) The Shoresh Defendants supplement this by arguing that a stay is also warranted under equitable considerations "includ[ing] the interests of judicial economy, the hardship and equity of the moving party in the absence of a stay, and the potential prejudice to the non-moving party in the event of a stay." *Landress v. One Solar LLC*, 243 F. Supp. 3d 633, 646 (M.D.N.C. 2017) (citation omitted); (see also ECF No. 27 at 7).[8] Consideration of these factors leads the Court to conclude that this matter should be stayed pending disposition of the Underlying Lawsuits, but only with respect to USLIC's duty to indemnify Krawatsky or the Shoresh Defendants. The grant of such a stay also avoids the entanglement concerns outlined in the Court's analysis of the *Nautilus* factors. *See supra* Part III.A.1.b.

### 1. Duty to Defend

As explained above, the *Nautilus* factors do not support abstaining from deciding the claims related to USLIC's duty to defend Krawatsky or the Shoresh Defendants. *Id.* at Part III.A.1.a. The Shoresh Defendants' additional argument in favor of a stay in determining USLIC's duty to defend are also unconvincing. In their motion, the Shoresh Defendants primarily argue

---

[8] Krawatsky's Motion to Incorporate seeks to adopt the Shoresh Defendants' argument that a stay is appropriate based on consideration of these equitable factors. (See ECF No. 44 ¶ 8d.) Given that Krawatsky could have timely moved for a stay at the time he filed his Motion to Incorporate, the Court will permit him to adopt this argument. (See ECF No. 45 ¶ 9 ("USLI[C] opposes Krawatsky's Joinder Motion to the extent that it was not timely filed and, therefore, should not be considered by this Court.").) Although it grants Krawatsky's Motion to Incorporate as to this argument, the Court declines to stay USLIC's claims related to its duty to defend Krawatsky for the same reasons it declines to stay the same claims made against the Shoresh Defendants.

23

that, absent a stay, they will face hardship in the form of "defending two complex and expensive litigations, in two separate courts, with two separate sets of counsel." (ECF No. 27 at 7.) As an initial matter, many of these alleged hardships, such as the "need to make decisions about discovery positions, strategies, and defenses, with determinations about whether a position may be beneficial to their defense in one case but perhaps detrimental in the other" do not exist with respect to the duty to defend issue. (*Id.*) For instance, the Shoresh Defendants agree that there is no discovery with respect to this issue beyond the allegations in the Underlying Lawsuits and the Policy. (*Id.* at 2–5.) Similarly, because determining whether the allegations in the Underlying Lawsuits give rise to a potentiality of coverage under the Policy can be resolved independently of the merits of the Underlying Lawsuits, *see supra* Part III.A, the Court sees no risk of prejudicial judicial estoppel arising from litigation of USLIC's duty to defend. Indeed, the Shoresh Defendants laid out their substantive position with respect to this issue *in the same memorandum* that requested a stay of this matter. (*See id.*)

Last, the general duty to litigate both matters simultaneously does not "make out a clear case of hardship or inequity in being required to go forward." *Williford v. Armstrong World Indus., Inc.*, 715 F.2d 124, 127 (4th Cir. 1983) (quoting *Landis v. N. Am. Co.*, 299 U.S. 248, 255 (1936)). Importantly here, a stay of this matter will not obviate the need to adjudicate USLIC's duty to defend under the Policy but merely delay that adjudication until the resolution of the Underlying Lawsuits. That delay would be prejudicial to USLIC because it would be locked into a status quo with which it clearly disagrees. On the other hand, the benefit to the movants would be minimal, as the issue of USLIC's duty to defend is already fully briefed and ripe for disposition. A weighing of these competing interests establishes that a stay with respect to USLIC's duty to defend is not

justified "by clear and convincing circumstances outweighing potential harm to the party against whom it is operative." *Id.*

### 2. Duty to Indemnify

A different analysis obtains with respect to USLIC's duty to indemnify Krawatsky and the Shoresh Defendants and whether that duty is primary or excess of Markel's insurance obligations. Initially, Markel argues that it is doubtful whether this obligation is ripe until the disposition of the Underlying Lawsuits. (ECF No. 50 at 7.) Under Maryland law, "the duty to indemnify *depends* upon liability," meaning that resolution of the scope of that duty is likely premature until liability has been definitively established. *Walk*, 852 A.2d at 106; *see also 200 W. Cherry St.*, 383 F. Supp. 3d at 509 (some emphasis added) ("The duty to indemnify, however, is triggered only if the insured's *established* liability is *actually* covered under the policy."). *But see Penn-Am. Ins. Co.*, 368 F.3d at 413 (emphases in original) (applying Virginia law and finding that "[a]lthough an insurer's duty *to indemnify* will depend on resolution of facts alleged in the complaint, no such factfinding is necessary if there is no duty *to defend* because the allegations, even when taken as proved, would fall outside the policy's coverage.").

Even were the Court able to presently address USLIC's duty to indemnify, courts in this district have generally found that considerations of judicial economy favor deferring such a determination until liability is established or defeated in the underlying lawsuit. *See Preston*, 2019 WL 3067918, at *3 (finding that where liability in the lawsuit is "undetermined, a declaratory judgment is premature, as it resolves a question that may never become ripe, based on facts that are purely hypothetical"); *Powe*, 2020 WL 1159000, at *3 ("[I]t could be inefficient for the court to decide questions of indemnity prior to resolution of the Underlying Suit, as any declaratory judgment . . . would be moot if the [ ] Insureds prevail in state court."). In contrast to the duty-to-

25

defend claims, the prejudice to USLIC from a stay is also more limited as a delayed determination of its duty to indemnify in the Underlying Lawsuits does not leave it with uncertainty as to its present legal obligations. In light of these considerations, the Court concludes that the equities cut in favor of a stay with respect to USLIC's claims for a declaratory judgment on its duty to indemnify. *See Raplee v. United States*, 842 F.3d 328, 335 (4th Cir. 2016) ("[D]eciding whether to stay proceedings . . . calls for the exercise of judgment, which must weigh competing interests and maintain an even balance.") (internal quotation marks and citation omitted). Those claims, and the related claim regarding whether that duty is primary or excess to Markel's, will be stayed pending disposition of the Underlying Lawsuits.

### D. USLIC's Duty to Defend

Turning to the merits, USLIC, Krawatsky, and the Shoresh Defendants all seek a dispositive determination in their favor regarding USLIC's duty to defend the Underlying Lawsuits. (*See* ECF Nos. 27, 32, 54.) In determining whether an insurer owes a duty to defend under Maryland law, courts look to "the allegations in the tort actions. If the plaintiffs in the tort suits allege a claim covered by the policy, the insurer has a duty to defend." *Md. Cas. Co. v. Blackstone Intern. Ltd.*, 114 A.3d 676, 682 (Md. 2015) (quoting *Brohawn*, 347 A.2d at 850). "Two types of questions ordinarily must be answered: (1) what is the coverage and what are the defenses under the terms and requirements of the insurance policy? [and] (2) do the allegations in the tort action potentially bring the tort claim within the policy's coverage?" *Id.* (quoting *Pryseski*, 438 A.2d at 285).

In answering the first question, "[a]n insurance contract, like any other contract, is measured by its terms unless a statute, a regulation, or public policy is violated thereby." *Pac. Indem. Co. v. Interstate Fire & Cas. Co.*, 488 A.2d 486, 488 (Md. 1985). Courts construe those

26

terms according to their "customary, ordinary, and accepted meaning." *Cochran*, 651 A.2d at 862 (quoting *Mitchell v. Md. Cas.*, 595 A.2d 469, 475 (Md. 1991)). In determining the meaning of the terms of an insurance contract, a Court should also be cognizant of "the character of the contract, its purpose, and the facts and circumstances of the parties at the time of execution." *Id.* (quoting *Pac. Indem. Co.*, 488 A.2d at 488.)

Once the Court has ascertained the scope of coverage provided by the insurance contract, it must next determine whether "the allegations in the tort action *potentially* bring the tort claim within the policy's coverage[.]" *Md. Cas. Co.*, 114 A.3d at 682 (citation omitted) (emphasis added). A potentiality of coverage may be established "[e]ven if a tort plaintiff does not allege facts which clearly bring the claim within or without the policy coverage." *Id.* "Stated differently, in case of doubt as to whether or not the allegations of a complaint against the insured state a cause of action within the coverage of a liability policy sufficient to compel the insurer to defend the action, *such doubt will be resolved in insured's favor.*" *Cochran*, 651 A.2d at 864 (emphasis in original) (internal quotation marks and citation omitted).

Last, in limited circumstances, "an insurer's duty to defend is not determined solely by the eight corner rule (reviewing the complaint and policy) but rather includes consideration of extrinsic evidence." *Walk*, 852 A.2d at 104. In a circumstance where "the underlying complaint neither conclusively establishes nor negates a potentiality of coverage," extrinsic evidence may be used to "demonstrate[] that there is a reasonable potential that [an] issue triggering coverage will be generated at trial." *Id.* at 106–07 (internal quotation marks and citation omitted). The parties agree that consideration of extrinsic evidence is not implicated in this case, contending instead that the duty-to-defend issues can be resolved as a matter of law by reference solely to the Underlying Countercomplaint and the Policy. (*See* ECF Nos. 27 at 2–3, 32-1 at 6, 54-1 at 11–15.)

Accordingly, the Court's analysis will be limited to whether these two documents establish that USLIC has a duty to defend either Krawatsky or the Shoresh Defendants.

### 1. USLIC's Duty to Defend Krawatsky[9]

The relevant parties have cross-moved for summary judgment on the question of whether USLIC has a duty to defend Krawatsky in the Underlying Lawsuits. (*See* ECF Nos. 32, 54.) USLIC principally argues that it has no duty to defend Krawatsky because coverage under the Policy is limited to acts taken within the scope of employment. (ECF No. 32-1 at 10–17.) It alternatively argues that various exclusions and Maryland public policy would preclude coverage even if the terms of the Policy facially applied to the underlying allegations against Krawatsky. (*See id.* at 17–28.) Krawatsky rejoins that USLIC misreads the Policy and that, properly interpreted, there is a potentiality of coverage that is not foreclosed by any exclusions or by Maryland public policy. (*See generally* ECF No. 54-1.) Parsing these arguments, the Court concludes that both the D&O and EPL Sections only provide coverage for actions taken within the scope of employment and that the allegations in the Underlying Counterclaims do not allege any such actions on the part of Krawatsky. Because this conclusion forecloses coverage under the

---

[9] Krawatsky also moved to adopt certain arguments related to USLIC's duty-to-defend raised in the Shoresh Defendants' Reply in Support of their Motion to Dismiss. (ECF No. 44.) This Motion sought to adopt certain substantive arguments made in the Shoresh Defendants' Reply in support of their Motion to Dismiss. (*See id.*) USLIC opposed that Motion on the grounds that it represented an untimely attempt to supplement the claims made in Krawatsky's own Motion to Dismiss. (*See* ECF No. 45 ¶ 8.) A review of the arguments that Krawatsky seeks to adopt also reveals that many of them are not pertinent to him as they relate to the fact that the claims alleged against the Shoresh Defendants fall within the scope of the Policy. (*See* ECF No. 44 ¶¶ 8b–d.)

In addition, Krawatsky subsequently filed a Motion for Summary Judgment wherein he more explicitly made the arguments he believes warrant a decision on the merits in his favor. (*See* ECF No. 54.) That Motion, filed after the Shoresh Defendants' Reply, provided Krawatsky a more appropriate vehicle to adopt any arguments made in the Shoresh Defendants' filings that he believed were pertinent to his case. As such, the Court sees no reason to permit Krawatsky to untimely incorporate those arguments into his Motion to Dismiss. Further, the contentions raised in the Shoresh Defendants' reply would not alter the Court's conclusion with respect to the merits of the claims against Krawatsky. For all of these reasons, Krawatsky's Motion to Incorporate will be denied insofar as it seeks to incorporate arguments other than those in favor of a stay pending disposition of the Underlying Lawsuits. *See supra* at 23 n.8.

Policy, the Court does not consider whether such coverage is independently precluded by the Policy's exclusions or Maryland public policy.

### a. The Scope of the Policy

As detailed above, various provisions in the Policy expressly limit coverage only to conduct related to an Insured's employment with Shoresh Inc. To reiterate, the D&O Section limits coverage to Wrongful Acts, which are defined in relevant part as "any actual or alleged act, error, omission, misstatement, misleading statement, neglect or breach of duties, or Personal Injury Act committed or allegedly committed . . . by the Individual Insureds *arising solely from duties conducted on behalf of the Organization*." (Policy at 9 (emphasis added).) Moreover, Krawatsky argues that he is an individual insured based on his status as an Employee (*See* ECF No. 54-1 at 12 n.4), a defined term which similarly limits its scope to "person[s] whose labor is service is engaged by and directed by the Organization *while performing duties related to the conduct of the Organization's business*." (Policy at 9 (emphasis added).)

The EPL Section contains the same definition of Employee. (Policy at 16.) Its key coverage definition, Wrongful Employment Acts, is also limited to actual or alleged conduct "committed or allegedly committed by the Organization or by an Individual Insured *acting solely within his/her capacity as such* . . . or asserted against an Individual Insured *because of his/her status as such*." (Policy at 19.) Further still, the EPL Section defines Third Party Harassment, the arguably relevant type of Wrongful Employment Act, as "Sexual Harassment . . . against a Third Party [c]ommitted or allegedly committed by an Insured *in their capacity as such* while the Insured is *performing duties related to the conduct of the Organization's business*." (*Id.*) Thus, in both portions of the Policy, both the class of insured persons and the nature of insured actions are explicitly tied to conduct related to the Organization's business.

29

### i.    *Text of the Policy*

USLIC argues that these various provisions plainly limit coverage for Krawatsky to only those actions that he took within the scope of his employment. (*See* ECF No. 32-1 at 10–11.)  This reading comports with the Maryland definition of the scope of employment, which looks to whether tortious conduct was "done by the employee in furtherance of the employer's business and [was] such as may fairly be said to have been authorized by him.  By 'authorized' is not meant authority expressly conferred, but whether the act was such as was incident to the performance of the duties entrusted to the employee." *Ennis v. Crenca*, 587 A.2d 485, 489 (Md. 1991) (citation omitted) (cleaned up).  The symmetry between the Policy language and the Maryland scope of employment test strongly suggests that the former was intended to track the latter.  Maryland courts interpreting similar language in other insurance policies have also found that such language limits coverage to actions taken within the scope of employment. *See Harleysville Preferred Ins. Co. v. Rams Head Savage Mill, LLC*, 187 A.3d 797, 815 (concluding that policies that limited coverage to members "only with respect to the conduct of your business" and managers "only with respect to their duties as your managers" provided coverage only for actions taken within the scope of employment); *see also Pryseski*, 438 A.2d at 189 (concluding that policy extending to "any employee . . . while acting within the scope of his duties" limited coverage to actions taken within the scope of employment).

Krawatsky does not seriously contest this reading of the Policy as a matter of its plain text.  While he argues that "USLIC impermissibly interprets the definition of 'arising solely out of' in a vacuum," Krawatsky does not engage with the various other textual indicia limiting coverage under the Policy to actions related to an employee's duties for the insured Organization.  (ECF No. 54-1 at 16.)  In addition to failing to explain how these other clauses do not support USLIC's

reading of the Policy, he also fails to explain how they support his view that the Policy is intended to cover any alleged act that "occurred at the time Krawatsky was employed at Camp Shoresh." (*Id.* at 14.) Indeed, at times Krawatsky seems to concede that the Policy only covers conduct that allegedly occurred while he was "performing duties related to Shoresh's business." (*Id.* at 12.)

### ii.    *Structure of the Policy*

Rather than identify the textual basis for his more expansive reading of the Policy, Krawatsky instead principally focuses on inconsistencies that he argues would result from USLIC's reading of the Policy terms. First, he argues that limiting the Policy coverage to acts within the scope of employment "would render the 'sexual harassment' coverage superfluous" because "[n]o form of sexual harassment could ever be considered to arise out of [an] 'insureds duties on behalf of the Organization.'" (*Id.* at 21.) This argument misunderstands either USLIC's reading of the Policy, the legal bounds of the scope of employment, or both.

"The general rule is that sexual harassment by a supervisor is not conduct within the scope of employment." *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 757 (1998). This rule is not absolute, as, "courts have held that where an employee is able to sexually harass another employee because of the authority or apparent authority vested in him by the employer, it may be said that the harasser's actions took place within the scope of employment." *Ohio Risk Gov't Mgmt. Plan v. Harrison*, 874 N.E.2d 1155, 1157–58 (Ohio 2007) (internal quotation marks and citation omitted). Maryland courts have also held that certain conduct that would constitute Sexual Harassment under the Policy falls within the scope of employment. In *Montgomery County*, the Maryland Court of Appeals found that conduct, including "personal gifts, sending food to [the victim's] home, writing love letters and cards to him, [and] inviting him into her bedroom" potentially fell within the scope of a teacher's employment. *Montgomery Cnty. Bd. of Educ. v.*

31

*Horace Mann Ins. Co.*, 860 A.2d 909, 920 (Md. 2004). These actions would also likely fall within the Policy as "unwelcome sexual advances, requests for sexual favors *or other verbal or physical conduct of a sexual nature* against a Third Party." (Policy at 19 (emphasis added).) In short, while superfluity concerns may counsel against a literal reading of the definition of Wrongful Employment Act to situations where an Insured is "acting *solely* in his/her capacity [as an Employee,]" they do not preclude reading that term as coextensive with the scope of employment. (*Id.* (emphasis added).)

A similar analysis rejects Krawatsky's second argument that USLIC's interpretation of the Policy would render Exclusion IV(B) superfluous. Exclusion IV(B), which appears in both parts of the Policy, excludes from coverage "[c]onduct of the Insured or at the Insured's direction that is fraudulent, dishonest or criminal provided that this exclusion will not apply to [ ] Defense Costs incurred until such conduct is proven in fact to be fraudulent dishonest or criminal." (*See* Policy at 9, 20.) Like sexual harassment, criminal conduct is also not categorically outside of the scope of employment. Rather, "[a]n act may be within the scope of employment although forbidden or done in a forbidden manner; although consciously criminal or tortious; [or] although done in part to serve the purposes of the servant or a third person." *Fidelity First Home Mortg. v. Williams*, 56 A.3d 501, 515 (Md. Ct. Spec. App. 2012) (quoting *Rusnack v. Giant Food, Inc.*, 337 A.2d 445 (Md. 1975)). Thus, while most criminal conduct may fall outside of the scope of employment, the limitation of coverage to actions taken within the scope of employment does not render Exclusion IV(B) superfluous. *See Fidelity First*, 56 A.3d at 515 ("[T]he foreseeability and the seriousness of criminal conduct both are highly relevant in determining whether an intentional tort falls outside the scope of employment."). Again, this fact may counsel against an unduly narrow reading of certain limits within the Policy, but it does not require this Court to deny those terms their

"customary, ordinary, and accepted meaning." *Cochran*, 651 A.2d at 862 (quoting *Mitchell v. Md. Cas.*, 595 A.2d 469, 475 (Md. 1991)).

Krawatsky's third and final argument with respect to the Policy terms is that the terms are ambiguous because of the discontinuities between the definitional terms that tie Policy coverage to actions taken in relation to an Insured's duties. He points out that, under the EPL Section, sexual harassment can constitute Third Party Harassment if it is committed while an Insured "is performing duties related to the conduct of the Organization's business" but is a Wrongful Employment Act only if the Insured is "acting *solely* within his/her capacity as [an Employee]." (Policy at 19 (emphasis added).) Even if these differences are sufficiently material to render the Policy ambiguous, Krawatsky fails to explain how that ambiguity could possibly be resolved to extend to all acts "which allegedly occurred at the time Krawatsky was employed at Camp Shoresh" regardless of whether those acts were tied to Krawatsky's duties. (ECF No. 54-1 at 17.) Rather, the ambiguity seems to be between whether the Policy provides coverage for all actions within the scope of employment, i.e. inclusive of actions "*incident* to the performance of the duties entrusted to the employee," *Ennis*, 587 A.2d at 489 (emphasis added), or, more narrowly, provides coverage only for those actions that are "*solely* within [an Employee's] capacity as such." (Policy at 19 (emphasis added); *see also* Policy at 9 (emphasis added) (limiting Wrongful Acts to acts committed "by the Individual Insureds arising *solely* from duties conducted on behalf of the Organization").) While choosing between these two readings may be an arguable point, it is also an academic one, as USLIC has already agreed that the best reading of the Policy is the *broader* of the potential options. (*See* ECF No. 32-1 at 6 ("[N]either liability coverage section provides insurance coverage for acts or conduct allegedly performed by an Individual Insured which is outside the scope of his employment."). Krawatsky simply fails to identify any reason this

33

ambiguity should resolve to an even broader reading of the Policy and thus cannot avail himself of the rule that "ambiguity [in an insurance contract] will be construed against the insurer as the drafter of the instrument." *Sullins v. Allstate Ins. Co.*, 667 A.2d 617, 619 (Md. 1995) (collecting cases).

In sum, the text of the Policy repeatedly ties coverage to whether an alleged action relates to an employee's duties with the Organization. This language closely tracks the scope of employment inquiry, the "overall test [for which] is whether . . . the act was such as was incident to the performance of the duties entrusted to the employee." *Ennis*, 587 A.2d at 489 (internal quotation marks omitted). It is also closely analogous to text that Maryland courts have historically interpreted as imposing this limitation on policy coverage. *See Rams Head*, 187 A.3d at 815; *Pryseski*, 438 A.2d at 283. Krawatsky fails to explain why this Court should depart from this established interpretation and read these phrases more broadly than their "customary, ordinary, and accepted meaning" to include all actions taken by an employee without regard to whether that action is related to that employee's duties. *Cochran*, 651 A.2d at 862 (quoting *Mitchell v. Md. Cas.*, 595 A.2d 469, 475 (Md. 1991)).

Further, a proper understanding of the scope of employment harmonizes the Policy's terms and exclusions and does not, as Krawatsky argues, create significant superfluities. Last, although Krawatsky identifies certain textual ambiguities in the Policy, those ambiguities, at best, suggest that the Policy's coverage may plausibly be *narrower* than the scope of employment test—a view that USLIC disclaims. For all these reasons, the Court agrees with USLIC that acts that "fall *outside* the scope of [Krawatsky's] employment with Camp Shoresh . . . do not trigger coverage under the Policy." (ECF No. 32-1 at 12 (emphasis in original).)

34

### b. *Allegations in the Underlying Lawsuits*

The Court now turns to whether the allegations in the Underlying Lawsuits aver any conduct that occurred within the scope of Krawatsky's employment. They do not. As consolidated in the Underlying Countercomplaint, the Underlying Lawsuits allege multiple counts including Assault, Battery, False Imprisonment, and Invasion of Privacy. (*See* ECF No. 32-6 at 39–42, 54–55.) Other than Count 15, all of the allegations against Krawatsky in the Underlying Countercomplaint relate to his alleged sexual abuse of B.A., S.B. and O.B. (*See Id.* at 55 ("Count 15: Invasion of Privacy—Unreasonable Publicity Given to Private Life").) Krawatsky does not argue that Count 15 triggers USLIC's duty to defend, nor can the Court see how it could.[10] Rather, he argues that (1) USLIC is estopped from disclaiming a duty to defend based on representations made in its Reservation of Rights Letter and (2) certain tortious conduct alleged in the Underlying Lawsuits falls within the scope of Krawatsky's employment. Ultimately the Court concludes that neither argument is persuasive.

### i. *Reservation of Rights Letter*

Krawatsky's first argument suggests that the letter issued by USLIC agreeing to provide him with a defense under a full reservation of rights prevents them from now disclaiming that duty because it "acknowledged a potentiality of coverage." (ECF No. 54-1 at 22.) While he does not squarely claim that this letter legally precludes USLIC from disclaiming a duty to defend, he argues that "[t]he letter implies that the potentiality of coverage must have been apparent to USLIC on the allegations alone [and] USLIC has cited nothing from the state court proceedings (or anything else) indicating why its position has changed." (*Id.* at 23.) To the extent Krawatsky argues that

---

[10] Specifically, this Count would fall within the D&O Section's exclusion for "any actual or alleged . . . invasion of privacy" and would not meet the EPL Section's definition of a Wrongful Employment Act as the conduct alleged would not amount to Third Party Harassment as that term is defined in the Policy. (*See* Policy at 19, 24.)

this letter is controlling, that argument must be rejected because "insurance company letters do not extend coverage by estoppel when it otherwise would not exist." *Provident Bank of Md. v. Travelers Property Cas. Corp.*, 236 F.3d 138, 145 (4th Cir. 2000) (citing *Prudential Ins. Co. of Am. v. Brookman*, 175 A. 838, 840 (Md. 1934)).

Similarly, while "these prelitigation interpretations by [the insurer] and its independent counsel are highly probative of the parties' actual intent," a review of the USLIC letter does not show USLIC believed there was a potentiality of coverage based on the allegations in the Underlying Lawsuits. *Cf. id.* (finding that prelitigation letter stating "there does exist a potentiality of coverage . . . confirm[ed] the conclusion that the policy at issue provide[s] . . . both indemnity and a defense"). USLIC's letter did not admit a potentiality of coverage, instead listing various reasons (paralleling their arguments before this Court) that "coverage may be barred." (USLIC Letter to Krawatsky at 7, ECF No. 12-2.)[11] It then concludes that "[n]otwithstanding the foregoing limitations under the Policy for this matter, USLI[C] agrees to defend you[.]" (*Id.* at 7.) Thus, if the letter is suggestive of any intent on the part of USLIC it is that it "offer[ed] a defense under reservation of rights to avoid the risks that an inept or lackadaisical defense of the underlying action may expose it to if it turns out there is a duty to indemnify." *Applied Signal & Image Tech., Inc. v. Harleysville Mut. Ins. Co.*, 252 F. Supp. 2d 215, 218–19 (D. Md. 2003) (quoting *Terra Nova Ins. Co. v. 900 Bar, Inc.*, 887 F.2d 1213, 1219–20 (3d Cir. 1989)). As USLIC does not affirmatively concede the potentiality of coverage in the letter, its *decision* to defend Krawatsky neither controls nor otherwise impairs its ability to now argue that it has no *duty* to defend him.

---

[11] USLIC issued a second letter to Krawatsky that includes materially identical language to the key language discussed here. (*See* ECF No. 12-3.)

### ii.   *Potentiality of Coverage*

The Court next turns to whether "the allegations in the tort action potentially bring the tort claim within the policy's coverage[.]" *Md. Cas. Co.*, 114 A.3d at 682 (citation omitted). Because the tort claims against Krawatsky in the Underlying Lawsuits all allege serious acts of child sexual abuse the Court concludes that they are not potentially within the scope of the Policy as they are categorically outside the scope of employment. This is confirmed by the fact that the counter-plaintiffs in the Underlying Lawsuits do not allege that the conduct was within the scope of Krawatsky's employment or attempt to hold the Shoresh Defendants vicariously liable for that conduct. *See supra* Part III.A.

Maryland courts have consistently held that "[a]part from being malicious, sexual abuse of a minor is criminal conduct . . . that it is not within the scope of a teacher's employment or authority." *Montgomery Cnty.*, 860 A.2d at 920; *Tall*, 706 A.2d at 670–71 (collecting cases from other jurisdiction confirming the same and extending holding to employment contexts other than schoolteachers). That said, where a complaint alleges both sexual abuse and liability for other predatory conduct, the allegations may come within the scope of employment and a potentiality of coverage. *See Montgomery Cnty.*, 860 A.2d at 920 ("[T]here was more alleged and discovered here . . . than simply sexual abuse, and that is what dooms the board's position [that the actions were outside the scope of employment]."). For example, in *Montgomery County*, the Maryland Court of Appeals found that a potentiality of coverage existed where a complaint alleged sexual abuse but also "non-sexual conduct" including love letters and gifts. 860 A.2d at 921. Similarly, in *Horace Mann Ins. Co.*, the case on which *Montgomery County* relied, the Supreme Court of California concluded that there was a potentiality of coverage for a complaint alleging sexual abuse where "the complaint [also] evinced a possibility that [the insured] would be held liable for

37

damages within the coverage of the policy stemming from [the insured's] negligent nonsexual conduct in his public relationship with [the victim]." *Horace Mann Ins. Co. v. Barbara B.*, 846 P.2d 792, 797 (Ca. 1993).

Here, however, there is no potentiality of coverage because there is no claim in the Underlying Lawsuits that suggests that Plaintiffs are claiming harm arising out of anything other than Krawatsky's alleged sexual abuse of B.A., S.B., and O.B.  Rather, the Underlying Countercomplaint alleges claims of assault, battery, and false imprisonment that relate directly to sexual abuse and claims of invasion of privacy stemming from photographs Krawatsky allegedly took while abusing B.A. and S.B. (*See* Underlying Countercompl. ¶¶ 99, 125, 356–380, 483–492.) While there are certain allegations related to Krawatsky's public behavior with B.A., S.B., and O.B. (*see, e.g., id.* ¶¶ 53–54, 147), there is no indication that the claims are seeking "compensation [t]hat covered more than just the alleged sexual abuse." *Montgomery Cnty.*, 860 A.2d at 921.

The only claim that could possibly aver harms outside of the alleged sexual abuse is Count 14 which alleges that Krawatsky assaulted O.B. on several occasions in the summer of 2014 and 2015. (*See* Underlying Countercompl. ¶¶ 487–92.) The allegations underlying this claim are potentially more expansive than those underlying the battery and false imprisonment claims of B.A. and S.B. (*See id.* ¶ 489 (alleging that "[t]he threats of imminent physical harm to O.B. were made with both words and conduct"). Ultimately, however, it only seeks compensation for harms that were caused "[a]s a direct and proximate result of the assaults by [Krawatsky] against O.B." (*Id.* ¶ 492.) Thus, it too fails to allege the sort of claim that has been found to give rise to a duty to defend in similar cases.

Because the Underlying Countercomplaint does not makes any pertinent claims related to allegations not involving sexual abuse, there is no "doubt as to whether or not the allegations of

[the] complaint against the insured state a cause of action within the coverage of [the] liability policy sufficient to compel the insurer to defend the action." *Cochran*, 651 A.2d at 864 (internal quotation marks and citation omitted). They do not and, accordingly, USLIC has no duty to defend Krawatsky in the Underlying Lawsuits.

### 2. *USLIC's Duty to Defend the Shoresh Defendants*

The Shoresh Defendants argue that USLIC's duty to defend them stems from two independent sources. First, they argue that Counts 7-12 of the Underlying Countercomplaint allege covered Third Party Harassment under the EPC Section of the Policy. Second, they argue that Count 16 potentially alleges a claim for "defamation" within the meaning of the add-back provision in Exclusion A of the D&O Section. While the Court concludes that the negligence claims asserted against the Shoresh Defendants in Counts 7-12 are not claims of Third Party Harassment within the meaning of the Policy, it finds that Count 16 sufficiently alleges a claim for defamation to create a duty to defend under the Policy. This latter conclusion is sufficient to find that USLIC owes the Shoresh Defendants a duty to defend the Underlying Lawsuits because "if an insurance policy potentially covers any claim in an underlying complaint, the insurer must typically defend the entire suit, including non-covered claims." *Selective Way Ins. Co. v. Nationwide Property and Cas. Ins. Co.*, 219 A.3d 20, 37 n.6, 41 (Md. Ct. Spec. App. 2019) (collecting cases).

### a. *Potentiality of Coverage for Counts 7-12*

The Shoresh Defendants argue that Counts 7-12 in the Underlying Countercomplaint are potentially covered by the EPL Section as acts of Third Party Harassment. Those claims allege that the Shoresh Defendants were negligent in preventing S.B., B.A. and O.B.'s alleged abuse at Camp Shoresh. (*See* Underlying Countercompl. ¶¶ 381–482.) The Shoresh Defendants argue that

these allegations constitute a Claim for Third Party Harassment within the meaning of the EPL Section. A review of the pertinent Policy terms shows that this is incorrect.

Once again reiterating the key terms, "Claim means: . . . [a]ny judicial or administrative proceeding initiated against any Insured seeking to hold such Insured responsible for a Wrongful Employment Act"; "Wrongful Employment Act [includes] any actual or alleged act of Third Party Harassment"; and "Third Party Harassment means . . . Sexual Harassment including any unwelcome sexual advances, requests for sexual favors or other verbal or physical conduct of a sexual nature against a Third Party." (Policy at 16, 19.)

Integrating these terms as relevant here establishes that Count 7-12 are not covered because they plainly to not "seek[] to hold [the Shoresh Defendants] responsible for [unwelcome sexual advances, requests for sexual favors or other verbal or physical conduct of a sexual nature against a Third Party]." (*Id.*) Rather, they seek to hold the Shoresh Defendants responsible for negligently creating conditions that permitted another person to allegedly engage in that conduct. Absent some allegation that the Underlying Lawsuits seek to hold the Shoresh Defendants directly liable for Krawatsky's alleged conduct, such as through *respondeat superior*, it is unduly attenuated to say that the Underlying Lawsuits seek to hold them "responsible for a[n] act of Third Party Harassment" rather than an act of negligence that permitted such harassment. (*Id.*); *see also S. Mgmt. Corp. v. Taha*, 836 A.2d 627, 638 (Md. 2003) ("Litigants may invoke the doctrine of respondeat superior as a means of holding an employer, corporate or otherwise, vicariously liable for the tortious conduct of an employee[.]").

### b. *Potentiality of Coverage for Count 16*

Alternatively, the Shoresh Defendants argue that USLIC's duty to defend is triggered by Count 16, which they argue is covered by the D&O Policy as a Wrongful Act. (*See* ECF No. 27

at 3–5.) While USLIC concedes that this claim is facially within the scope of the D&O Section, it

argues that it is categorically exempted from coverage by Exclusion A, which provides that:

> The Company shall not be liable to make payment for Loss or Defense Costs in
> connection with any Claim made against the Insured arising out of, directly or
> indirectly resulting from or in consequence of, or in any way involving any actual
> or alleged bodily injury, sickness, humiliation, mental anguish, emotional distress,
> assault, battery, invasion of privacy, wrongful entry, eviction, false arrest, false
> imprisonment, malicious prosecution, disease or death of any person, or damage to
> or destruction of any tangible property including any resulting loss of use; provided
> that this exclusion shall not apply to Claims for libel, slander or defamation that
> result from a Wrongful Act. However, coverage afforded for libel, slander or
> defamation shall be excess of the Insured's General Liability policy[.]

(Policy at 9, 24.) As noted, the parties' disagreement boils down to whether Count 16 is a "Claim[]

for libel, slander or defamation" such that it is within the "add-back" provision in Exclusion A.

(*Id.* at 24.)

Count 16 is titled "Intentional Infliction of Emotional Distress"—a label that USLIC

contends is dispositive of whether it is covered by the D&O Section. (*See* Underlying

Countercompl. at 55.) The Shoresh Defendants rejoin that the Policy is not so formalistic and is

instead intended to cover claims that sound in defamation, no matter how they are labeled. (ECF

No. 27 at 4.) They point to the allegations underlying Count 16 including that Finkelstein

"engage[d] in a calculated, intentional campaign to spread lies, half-truths, and other misleading

information"; that his "intent was to discredit [Krawatsky's] accusers"; and that he "sought to

ostracize [Krawatsky's accusers] from the Baltimore-Washington Orthodox Jewish Community."

(Underlying Countercompl. ¶¶ 500, 502, 506.) These allegations, the Shoresh Defendants argue,

are really an "attempt to allege a claim for defamation, with elements of: (1) that the defendant

made a defamatory statement to a third person, (2) that the statement was false, (3) that the

defendant was legally at fault in making the statement, and (4) that the plaintiff thereby suffered

harm." (ECF No. 27 at 4 (quoting *Piscatelli v. Van Smith*, 35 A.3d 1140, 1147 (Md. 2012)).)

Determining whether the add-back provision is intended to cover claims alleging
defamation in form or substance is ultimately immaterial for determining USLIC's duty to defend.
This is because in determining whether an insurer owes such a duty, courts generally consider
whether the complaint "state[s] *facts* sufficient to clearly bring the case within or without the
coverage [because] the general rule is that the insurer is obligated to defend if there is, *potentially*,
a case under the complaint within the coverage of the policy." *Cochran*, 651 A.2d at 864 (some
emphasis added). In the pleading context, facts are fundamentally distinct from "labels and legal
conclusions," *see Iqbal*, 566 U.S. at 678, and Maryland has also rejected rules that "leave[] the
insured with no choice but to rely on a plaintiff to file a well-pleaded complaint in order to establish
a potentiality of coverage under the insured's insurance policy." *Cochran*, 651 A.2d at 866. Thus,
while these labels may be helpful guideposts, "the [duty-to-defend] inquiry focuses on substance,
not labels." *Unwired Sols., Inc. v. Ohio Sec. Ins. Co.*, 247 F. Supp. 3d 705, 708 (D. Md. 2017).

The focus on substance means that "the relevant inquiry is whether the underlying lawsuit
alleges or implies" a covered claim, "regardless of how [the plaintiff] labeled its counts." *Id.*; *see
also All Class Const., LLC v. Mutual Ben. Ins. Co.*, 3 F. Supp. 3d 409, 420 (D. Md. 2014) ("If one
were to look only at the Underlying Complaint's headings for the various counts against Plaintiffs,
then one would quickly conclude that no [ ] coverage exists for any of the causes of action named.
However, it is necessary to examine the particular allegations in the Underlying Complaint to
determine whether a potentiality of coverage exists."); *cf. Walk*, 852 A.2d at 108 ("Although the
plaintiffs need not have used the words 'advertising injury,' or labeled a count in the complaint as
'advertising injury,' Walk cannot establish a potentiality of coverage unless the plaintiffs alleged,
in substance, an 'advertising injury.'"). While Count 16 may fall outside the Policy for purposes
of indemnity based on the facts ultimately proven at trial, the pertinent question here is whether

42

"there is, *potentially*, a case [for defamation] under the complaint" based on the facts plead. *Cochran*, 651 A.2d at 864 (emphasis in original).

The allegations in the Underlying Countercomplaint create a duty to defend because they allege all four elements of defamation against the Shoresh Defendants. First, it alleges that the Shoresh Defendants made a number of false statements intended to discredit and ostracize Krawatsky's accusers establishing the two principal elements of defamation. (*See* Underlying Countercompl. ¶¶ 500, 502, 506); *see also Doe v. Johns Hopkins Health Sys. Corp.*, 275 F. Supp. 3d 355, 365 (D. Md. 2017) ("Under Maryland law, to establish a *prima facie* case of defamation, a plaintiff must establish [*inter alia*] that (1) the defendant made a defamatory statement to a third person [and] (2) the statement was false."). Second, it alleges that both Finkelstein and Shoresh, Inc. were legally at fault because they made these statements knowingly and intentionally. (Underlying Countercompl. ¶¶ 500 ("[Finkelstein] personally undertook to engage in a calculated, intentional campaign to spread lies."); 501 ("Shoresh, Inc. supported [Finkelstein's] efforts with manpower and financial resources and mirrored his efforts.")); *see also Johns Hopkins*, 275 F. Supp. 3d at 365 ("Establishing the third element . . . requires a showing that, at a minimum, the party making the false statement acted negligently."). Last, the Underlying Countercomplaint alleges damages resulting from the Shoresh Defendants' false statements. (Underlying Countercompl. ¶ 508); *see also Hearst Corp. v. Hughes*, 466 A.2d 486, 493 (Md. 1983) ("Absent defamatory words of some type there is no tort of defamation. But here there is a publication of false and defamatory matter from which harm to reputation is presumed. The tort is defamation even though the harm proven to satisfy *Gertz* is emotional distress.").

In sum, the Underlying Countercomplaint's allegations create at least the "*potentiality* that [Count 16] *could be* covered by the policy." *Walk*, 852 A.2d at 106 (some emphasis added).

43

Because this potential coverage arises from the face of the Underlying Countercomplaint, it is not barred, as USLIC argues, by the prohibition "that an insured cannot assert a frivolous defense merely to establish a duty to defend on the part of the insurer." (ECF No. 34 at 7 (quoting *Cochran*, 651 A.2d at 866).) That prohibition precludes an insured from introducing certain types of *extrinsic* evidence to establish a duty to defend. *Cochran*, 651 A.2d at 866. Further, even if this were an extrinsic evidence case, such evidence is permitted when it "relate[s] in some manner to a cause of action actually alleged in the complaint." *Reames v. State Farm Fire and Cas. Ins.*, 683 A.2d 179, 186 (Md. Ct. Spec. App. 1996). As they rely entirely on the allegations in the Underlying Countercomplaint, the Shoresh Defendants are not arguing that extrinsic evidence creates a "new, unasserted claim that would create a duty to defend" but that the actually plead facts potentially allege a claim covered under the Policy. *Cf. Reames*, 683 A.2d at 186 (finding that the insured could not "demonstrate a reasonable potential that [the insured] would face a 'claim' or 'suit' for damages resulting from an assault and battery" where complaint only "alleg[ed] causes of action for malicious prosecution and abuse of process"). While this may be ultimately insufficient to establish a duty to indemnify, it is sufficient to establish a duty to defend. *Cochran*, 651 A.2d at 864 (emphasis in original) ("Where the complaint does not state facts sufficient to clearly bring the case within or without the coverage, the general rule is that the insurer is obligated to defend if there is, *potentially*, a case under the complaint within the coverage of the policy.").

### *E.  Other Insurance*

Having determined that USLIC has a duty to defend the Shoresh Defendants based on the allegations in Count 16, the Court must now consider whether that duty is primary or excess based on the Other Insurance provision contained in the Policy. (*See* Policy at 50.) That provision

44

provides that the "Policy shall be excess of and not contribute with other existing insurance, including but not limited to any insurance under which there is a duty to defend, unless such other insurance is specifically written to be in excess of this Policy." (*Id.*) USLIC argues that this provision renders any "indemnity coverage [ ] excess to the coverage under the Markel GCL Policies and/or Markel Umbrella Policies [(the 'Markel Policies')]." (ECF No. 32-1 at 33.) Markel rejoins that this is not so because the Markel Policies do not insure the Shoresh Defendants against the same risks as the USLIC Policy and are therefore not "other insurance."

As an initial matter, USLIC seeks a declaration that the Markel Policies require Markel to defend the claims of negligence asserted against the Shoresh Defendants. (*Id.* at 32.) Markel points out that this aspect of USLIC's claim is mooted by the fact that Markel is presently defending the Shoresh Defendants and has never contested its obligation to do so. (*See* ECF No. 32-8 at 1); *see also Already, LLC v. Nike, Inc.*, 568 U.S. 85, 91 (2013) ("[T]he case is moot if the dispute is no longer embedded in any actual controversy about the plaintiffs' particular legal rights.") (internal quotation marks and citation omitted); *Poston*, 88 F.3d at 256 (explaining that a declaratory judgment is only "appropriate when the judgment will serve a useful purpose in clarifying and settling the legal relations in issue, and . . . when it will terminate and afford relief from the uncertainty, insecurity, and controversy giving rise to the proceeding."). Thus, the only question is whether Markel's agreement to defend the Shoresh Defendants renders the Policy excess with respect to USLIC's duty to defend.

"In deciding whether one liability insurer is primary with respect to another, Maryland courts 'recognize that the rights and liabilities of different insurers should depend, as far as possible, upon the specific language of their policies.'" *Selective Way Ins. Co. v. Nationwide Prop. and Cas. Ins. Co.*, 219 A.3d 20, 46 (Md. Ct. Spec. App. 2019) (quoting *Nolt v. U.S. Fid. & Guar.*

*Co.*, 617 A.2d 578 (Md. 1993)).  More generally, "in order for an other insurance clause to operate

in [an] insurer's favor, there must be both an identity of the insured interest and an identity of risk."

15 Steven Plitt, *et al.*, COUCH ON INS. § 219:14 (3d ed. 2021) (hereinafter "Couch on Insurance").

Neither insurer disputes that the Markel Policies and the Policy insure the same interest (Shoresh,

Inc.) but they vehemently disagree on whether they insure the same risk. (*See* ECF No. 50 at 9–

11; ECF No. 61 at 4–6.).

### 1.  Other Insurance Covering Duty to Indemnify

While it is not clear whether USLIC presses this argument throughout its briefing, its initial

Motion suggests that USLIC's claim to being an excess insurer is predicated in part on the fact

that "any potential indemnity coverage is excess to the coverage under the Markel CGL Policies

and/or Markel Umbrella Policies." (ECF No. 32-1 at 32–33); *see also Selective Way*, 219 A.2d at

46 ("An excess insurer's duty to defend does not arise until the policy limits of the primary

coverage are exhausted."). (*But see* ECF No. 61 ("Alternatively, this Court should find that Markel

has a primary duty to defend against all claims asserted against the [Shoresh Defendants] in the

underlying tort lawsuits[.]").)  To the extent USLIC argues that it is not obligated to defend the

Shoresh Defendants because its indemnity obligations would be excess to Markel's, that argument

fails.

With respect to two insurer's duties to indemnify, courts have generally found that

insurance policies of different types insure against distinct risks such that an "other insurance"

clause is inapposite.  *See Fed. Ins. Co. v. Firemen's Ins. Co. of Wash. D.C.*, 769 F. Supp. 2d 865,

875 (D. Md. 2011) (concluding that D&O Policy and GCL Policy "were covering the insured for

different risks"); *see also Pac. Indem. Co. v. Linn*, 766 F.2d 754, 767 (3d Cir. 1985) (GCL policy

"insured against a risk distinct from the professional liability covered by [other] policies");

*Blackburn v. Fidelity and Deposit Co. of Md.*, 667 So. 2d 661, 671 (Ala. 1995) ("A review of the language of F&D's fiduciary responsibility policy and the Blackburn firm's professional liability insurance policy reveals that the policies do not cover the same risks."). That general rule bears out here, as the Policy does not potentially insure the same *claims*, much less the same *risks* as the Markel Policies with respect to each insurer's indemnity obligations. *See Pac. Indem. Co.*, 766 F.2d at 767 n.3 (concluding that insurance policies were not other insurance where if "claimant [ ] prevailed on one claim but not the other . . . only one of the insurers would have been obligated to indemnify [insured]"). As noted, USLIC's potential indemnity obligations exist only with respect to Count 16, which alleges intentional infliction of emotional distress by the Shoresh Defendants. (*See* ECF No. 32-6 ¶¶ 499–508); *see also supra* Part III.D.2.b. Markel has expressly disclaimed coverage for this claim, and neither USLIC nor the Shoresh Defendants have contested this assertion. (*See* ECF No. 32-8 at 1 ("Please note, as explained below, the [Markel] Policies do not provide coverage for plaintiffs' claims for intentional infliction of emotional distress.").) It is therefore difficult to see, and USLIC does not explain, how at this juncture the Markel Policy could be "other insurance" based on potentially overlapping indemnity coverage.

### 2. *Other Insurance Covering Duty to Defend*

More compelling is USLIC's argument that, in certain cases, an insurer may be excess in its duty to defend even if it is primary in its duty to indemnify. It cites to *Fieldston*, where the Court of Appeals of New York concluded that "based on the 'other insurances' clauses, [a] GCL policy [was] primary to [a] D&O policy as they relate to defense costs." *Fieldston Prop. Owners Ass'n v. Hermitage Ins. Co., Inc.*, 945 N.E.2d 1013, 1017 (N.Y. 2011). There, the D&O policy contained an "other insurance" clause that provided "that its coverage is excess where 'any Loss arising from any claim made against the Insured(s) is insured under any other valid policy(ies).'"

*Id.* at 1018. Loss was further defined to include Defense Costs. *Id.* Because the GCL insurer conceded its duty to defend the underlying lawsuits, the *Fieldston* court concluded that "under the terms of [the] D&O policy, there does exist 'other insurance' which would cover the 'loss' arising from the defense of the two underlying actions." *Id.* Therefore, the "[GCL insurer] had an obligation to defend both of the underlying actions without contribution from [the D&O insurer] . . . notwithstanding the fact that [the D&O insurer] would appear to have an obligation to indemnify [the insured] for a greater proportion of the causes of action, if successfully prosecuted." *Id.*

Reasoning similar to *Fieldston* gives best effect to Maryland's rule that "the rights and liabilities of different insurers should depend, as far as possible, upon the specific language of their policies." *Selective Way Ins. Co.*, 219 A.3d at 46 (internal quotation marks and citation omitted). The Policy's plain terms provide that it "shall be excess of and not contribute with other existing insurance, including but not limited to *any insurance under which there is a duty to defend.*" (Policy at 50 (emphasis added).) It is equally plain that the Markel Policies are "any insurance under which there is a duty to defend." (*Id.*) Markel fails to explain how this Court can conclude that USLIC has a primary duty to defend the Shoresh Defendants without functionally excising this language from the Policy.

Instead, its submission appears to be that the Court should conclude that the "Other Insurance" clauses in the policies are not relevant *in their entirety* because the Policy and the Markel Policies "do not provide coverage for the same risks." (ECF No. 50 at 11.) Such a wholesale rejection of the other insurance clause based on an abstract comparison of the risks covered by the policies contravenes the lodestar principle that the analysis of USLIC and Markel's relative obligations depends "upon the *specific language* of their policies." *Selective Way Ins. Co.*, 219 A.3d at 46 (emphasis added); *see also* Couch on Insurance § 219:17 (emphasis added) ("[I]t

is not necessary for both policies to cover the identical field. For the purposes of an 'other insurance' clause, it is sufficient that both policies provide overlapping coverage for the risk *involved*."). That specific language renders USLIC excess with respect to its duty to defend in the Underlying Lawsuits because the Markel Policies are "other existing insurance, including but not limited to any insurance under which there is a duty to defend." (Policy at 50.)

In summary, the Court's resolution of the various pending Motions leads to the following conclusions. First, neither state law nor federal discretion warrants dismissal of this declaratory judgment action pending resolution of the Underlying Lawsuits. Second, Maryland law and considerations of judicial economy compel this Court to stay disposition of USLIC's declaratory judgment claims regarding its duty to indemnify Krawatsky and the Shoresh Defendants and whether the latter duty is primary or excess to Markel's own duty to indemnify until the Underlying Lawsuits are resolved. Third, these same considerations do not similarly favor a stay of this case with respect to USLIC's duty to defend the Underlying Lawsuits. Fourth, on the merits, USLIC has no duty to defend Krawatsky because the allegations made against him in the Underlying Lawsuits categorically aver claims outside the scope of the Policy. Fifth, USLIC does have a duty to defend the Shoresh Defendants because Count 16 in the Underlying Lawsuits potentially alleges a claim within the scope of the Policy. Sixth, USLIC's duty to defend the Shoresh Defendants is excess to Markel's duty to defend the Shoresh Defendants.

### *IV.    Conclusion*

For the reasons set forth in this Memorandum, a separate Order shall issue denying Krawatsky's Motion to Dismiss (ECF No. 12); granting in part and denying in part the Shoresh Defendants' Motion to Dismiss and Alternative Motion to Stay (ECF No. 27); granting in part and denying in part USLIC's Motion for Summary Judgment (ECF No. 34); granting in part and

denying in part Krawatsky's Motion to Incorporate (ECF No. 44); and denying Krawatsky's Motion for Summary Judgment (ECF No. 54).


DATED this 24 day of March, 2022.


                                        BY THE COURT:

                                        James K. Bredar
                                        Chief Judge